**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**THIERNO BARRY,**<br><br>**Defendant.** | **Case No. 25-cr-175(RBW)**<br><br><br>**Sentencing Date:  May 18, 2026** |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

Overnight from March 30, 2025, into March 31, 2025, Thierno Barry (the Defendant) engaged in a dangerous, multi-jurisdictional crime spree driven by his effort to evade law enforcement. At the time, the Defendant was already on probation and pretrial release in multiple cases arising in New York and New Jersey.

The spree began when the defendant fled a traffic stop in Virginia, leading officers on a high-speed car chase from Virginia into Washington, D.C., reaching speeds exceeding 130 miles per hour at night without lights.  After abandoning his car in D.C., the Defendant attempted to divert law enforcement by falsely reporting a shooting at a nearby residence. That fabricated emergency triggered an armed police response and needlessly endangered the home's residents and responding officers.

The Defendant then fled to Union Station, where he carjacked an elderly couple, physically dragging an 88-year-old man from the driver's seat of his car. The Defendant then sped off without even taking the time to close the car door, nearly running his victim over in the process.  He then drove the car at high speeds into Maryland, where he was apprehended trying to change a flat tire. Even then, the Defendant gave false identifying information to law enforcement and threatened the officers.

This was not a momentary lapse in judgment. It was a reckless escalating course of conduct that endangered victims, police officers, and the public across multiple jurisdictions. The Defendant demonstrated a shocking disregard toward the grave danger resulting from his reckless criminal acts. He left an innocent family bewildered and frightened to be awoken by an armed police response to their home. He left his eighty-eight-year-old carjacking victim lying in the street, bloodied, bruised, and unable get up.

Due the terrifying and dangerous nature of the offense and the Defendant's history, the Government respectfully requests that the Court impose a sentence toward the top of the applicable Guidelines range, which the Government calculates to be **102 months of imprisonment**, followed by 3 years of supervised release, with regard to Counts One and Two. With regard to Count Three, the Government respectfully requests a sentence of **6 months to be served consecutively**.

## BACKGROUND

*Relevant Conduct*

At 10:53 p.m. on March 30, 2025, on Interstate 66 near Haymarket, Virginia, Virginia State Police ("VSP") initiated a traffic stop for reckless driving of the Defendant, who was driving a Volkswagen SUV affixed with a temporary Virginia license plate. The VSP trooper learned that the legitimate license plate was in the trunk of the vehicle during the course of the stop. At the time, the Defendant also had a suspended license. VSP issued a ticket for reckless driving and driving with a suspended license. Because the Defendant had a suspended license, VSP told the Defendant the car would be towed. While waiting for the tow, the Defendant remained in the vehicle. As the VSP trooper was walked back to his vehicle, the Defendant sped away—initiating a highspeed chase ultimately ending in Washington, D.C.

During this high speed vehicle pursuit, the Defendant used his cellphone to post to social

media, including a selfie-style Instagram photo with the caption "Run or pull over like a ?bitch" that was timestamped at 11:41 p.m.  Further, there was a video timestamped at 11:52 p.m., in which the Defendant narrated the high speed chase, saying: " . . . I'm talking about five state troopers on my a** bro!  I swear to god . . ."

At approximately 11:40 p.m., Fairfax County Police Department ("FCPD") initiated a helicopter pursuit of the Defendant, which was recorded on video.  During the pursuit, FCPD communicated over the radio that the Defendant's car was "blacked out" (*i.e.*, driving without his lights on), speeding, and at times driving on the wrong side of the road.  The Defendant drove into Washington, D.C., and, at approximately 12:02 a.m., abandoned the Volkswagen in the alley behind 4305 Reno Road Northwest.

Once the Defendant drove the Volkswagen into the alley, helicopter footage depicts the Defendant exit the driver's side of the Volkswagen and crouch next to the car.  FCPD alerted the Metropolitan Police Department ("MPD") to the pursuit and vehicle location.  MPD responded at 12:21 a.m. and recovered the Volkswagen but was unable to locate the Defendant. An image from the helicopter of the Defendant crouched beside his car is below:



The Defendant historical cell-site data indicated that he remained in the neighborhood for

3

the next two hours.

At 1:30 a.m., the Defendant used his cellphone to call 911 and make a false report, telling the operator that his ex-husband had shot his wife in the face and chest. He indicated that the shooter had driven away. The Defendant provided an address on Brandywine Street Northwest. MPD responded to the reported address, but did not observe any evidence of a shooting. MPD made contact with the residents of the house, CW-1 and CW-2, who were asleep when MPD arrived and had no knowledge of a shooting. A few minutes after the Defendant made the call, 911 operators attempted to call back the phone number that had made the report, but were sent to voicemail. The voicemail mailbox recording stated that the mailbox belongs to "Thierno Barry."

The extraction from the Defendant's cellphone shows that the Defendant (1) searched the address on Brandywine Street Northwest that he referenced during the 911 call in Apple Maps at 1:29 a.m. (one minute prior to the 911 call); and (2) made the call to 911. Additionally, according to DC OUC, the 911 caller's location resolved to 3618 Yuma Street Northwest, approximately 0.4 miles from the swatting victims' residence and a short distance from where the Defendant had abandoned the Volkswagen.

The Defendant remained in the area until approximately 2:31 a.m., when video footage shows him embarking on a WMATA bus at the 4200 block of Wisconsin Avenue Northwest.



Further video shows that the Defendant switched to a second bus at approximately 3:11 a.m. in the 2100 block of Pennsylvania Avenue Northwest.



Video then shows that the Defendant got off the second bus at approximately 3:23 p.m. on E Street NE—about 0.2 miles from Union Station.

Cell-site location data related to the Defendant phone indicates locations roughly consistent

with his bus.  In addition, the Defendant's phone contains a photograph on of the United States Capitol with metadata indicating that it was taken from a location approximately .2 miles from Union Station at 3:24 a.m. (see below).



Shortly after getting off of the bus, the Defendant entered Union Station.  Surveillance footage shows the Defendant in Union Station at approximately 3:37 a.m.  In addition, security guards reported that an individual matching the Defendant's description was kicked out of Union Station at approximately this time after making threats to commit a shooting there.

After leaving Union Station, the Defendant carjacked a Buick sedan from an 88-year-old man (CW-3) and 87-year-old woman (CW-4) in the street directly in front of the station. Surveillance video captured the incident. *See* **Exhibit A**.  CW-3 was driving and CW-4 was in the front passenger seat. The video shows that the Defendant walked up to the driver door of the car as it reversed slowly. When the Defendant reached the driver door, the car stopped. the Defendant then reached into the open window and the driver door opened. The Defendant stood in the open driver door and appeared to speak for almost 30 seconds.  The Defendant then walked around the back of the car to the front passenger door, which he opened.  At the same time, CW-3 closed the

driver door.  The Defendant walked back around the back of the car to the driver door and opened

the driver door again.  The Defendant then pointed away from the car several times. The Defendant

then grabbed hold of CW-3's upper body and physically wrenched his body out of the vehicle.

The Defendant threw CW-3 to the ground. The Defendant stepped over CW-3 and entered the

driver seat. As the Defendant entered the car, CW-4 got out of the passenger door.  The Defendant

drove the car away with the doors still open and CW-3 still on the ground in the immediate vicinity

of the car. From the time that the Defendant arrived at the driver door to when he drove away,

more than 90 seconds elapse, during which time the Defendant interacted extensively with both

victims. The rear wheel appeared to nearly run over CW-3, as depicted in the below still image

taken from the surveillance footage:



CW-3 and CW-4 sought help and entered Union Station, where they spoke to security staff

there.  A security guard told CW-3 and CW-4 that the carjacker matched the description of an

individual they had just thrown out of Union Station for being disorderly and making threats.

Security staff called 911 at approximately 3:58 a.m.

MPD was dispatched to 50 Massachusetts Avenue Northeast. Once on scene, MPD made contact with CW-3 and CW-4. Both victims gave brief accounts of the interaction which are captured on officers' BWC. During the 911 call and the BWC footage, the victims stated that the Defendant told them he had a gun and threatened their lives repeatedly, stating "Get out of the car! If you don't, I'm going to kill you." According to CW-3 and CW-4, at points during the carjacking, the Defendant held his hand inside his pocket to imitate the presence of a firearm. However, both victims stated that they did not actually observe a firearm. CW-4 told the Defendant that they were sick and needed the car to get to the hospital, but Defendant persisted in telling the victims to exit the car or he would kill them.

CW-3 declined medical treatment on scene and indicated that he did not initially notice any injuries but later found that his clothes were stuck to his arm and thigh because of dried blood. A photograph of the injuries to CW-3's arms is depicted below:



The MPD's RTCC was able to track the location of the stolen car through the vehicle's manufacturer, Buick. The car was tracked to 7619 Greenbelt Road, Greenbelt, Maryland 20770,

which is the address of an Exxon gas station. MPD notified members of the Greenbelt Police Department ("GPD") of the vehicle's location. At approximately 4:34 a.m., GPD responded to that address to canvass for the vehicle and suspect.

After arriving on scene, GPD located the carjacked vehicle in the parking lot of the Exxon gas station located at 7619 Greenbelt Road, Greenbelt, Maryland. They also observed the Defendant, who fit the description provided by MPD of the carjacking suspect, attempting to change a flat tire on the carjacked vehicle. A plain-clothes GPD detective approached the Defendant, who asked the detective for help. The Defendant was then stopped by GPD in connection with the carjacking. The Defendant initially provided the alias "Usaman Barrie" to Greenbelt PD upon his detention.

GPD officers took photographs of the Defendant and sent them to MPD officers, who showed them to the victims and the security guard. CW-3 stated that he could not be sure the individual depicted in the photograph was the suspect because the hoodie was covering part of his face. CW-4 stated it looked like the same suspect who had committed the carjacking and the clothing was very similar and he had the same skin complexion. The security guard positively identified the suspect as the individual who had previously threatened to shoot patrons of Union Station and was subsequently escorted from the location. The outfit worn by the Defendant at the time of the carjacking matched the outfit he wore at the time of his apprehension by GPD, as shown in the below comparison photo with the Defendant at the time of the carjacking on the left and in custody following his arrest on the right.

9



CW-3 and CW-4 later traveled to the location and confirmed that the vehicle discovered by GPD was theirs. Because the Defendant was in possession of the carjacked vehicle, he was placed under arrest for local Maryland charges, including Unlawful Taking of a Motor Vehicle, and transported to Greenbelt Police Station for processing. While at the Greenbelt Police Station, the Defendant spat on and assaulted multiple police officers.

GPD officers also located a cell phone in the car, which CW-3 and CW-4 indicated was not theirs. After obtaining a search warrant for the phone, FBI confirmed that it was the Defendant's through the number, linked accounts, and selfie photos.

In addition, the below photograph (left) recovered from the Defendant's phone with a listed time of 4:07 a.m. on March 31, 2025 shows the interior of a Buick consistent with the car taken from CW-3 and CW-4 and sandals which match the ones worn by the Defendant.



Further, the Defendant's phone also indicated that he placed a phone call to the number of "CK New and Used Tires" at 4:18 a.m., shortly before he was found attempting to change the tire of the Buick.

*Procedural History*

On June 12, 2025, a federal grand jury in the District of Columbia returned an indictment charging three counts: (1) Carjacking in violation of 18 U.S.C. § 2119(1); (2) Interstate Transportation of a Stolen Motor Vehicle in violation of 18 U.S.C. § 2312; and (3) False Alarms and False Reports in violation of D.C. Code 22-1319(a-1).[1]

The Defendant was indicted via a Superseding Indictment on February 13, 2025, by a

---

[1] The defendant was initially arrested on March 31, 2025, in Prince George's County Maryland, where he remained detained on other charges until October 24, 2025.

federal grand jury on six counts: Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) (Counts One through Five) and Conspiracy to Commit Trafficking in Firearms in violation of 18 U.S.C. § 933(a)(3) (Count Six).

On January 22, 2026, the Defendant pleaded guilty to all charges of the indictment without a plea agreement.

## APPLICABLE LAW

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –
 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
 (B) to afford adequate deterrence to criminal conduct;
 (C) to protect the public from further crimes of the defendant; and
 (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

      (4) the kinds of sentence and the sentencing range established for –
          (A) the applicable category of offense committed by the applicable
          category of defendant as set forth in the guidelines –
               (i) issued by the Sentencing Commission . . .; and
               (ii) that, . . . are in effect on the date the defendant is sentenced; . . .

      (5) any pertinent policy statement –
          (A) issued by the Sentencing Commission . . . and
          (B) that, . . . is in effect on the date the defendant is sentenced.

      (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

      (7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven

13

by a preponderance of the evidence and the sentence does not exceed the statutory maximum for

the crime of conviction.").

## THE APPLICABLE SENTENCING GUIDELINES

A. Counts One and Two

The applicable Guidelines are contested in this matter. The United States Probation Office

(USPO) prepared a Presentence Investigation Report (PSIR) with the following calculations:

**Carjacking (18 U.S.C. § 2119(1))[2]**

| U.S.S.G. § | Description | # |
|---|---|---|
| 2B3.1(a) | Base Offense Level | 20 |
| 2B3.1(b)(2)(E) | Dangerous Weapon Brandished | +3 |
| 2B3.1(b)(3)(A) | Bodily Injury | +2 |
| 2B3.1(b)(5) | Carjacking | +2 |
| Total Adjusted Offense Level | | 27 |
| 3E1.1 | Acceptance of Responsibility | -3 |
| *Total Offense Level* | *57-71 months at Crim History II* | ***24*** |

The Government objected to the draft PSIR, contending that two additional adjustments

should apply: 1) a two-level increase for a Victim Related Adjustment for Vulnerable Victims

pursuant to U.S.S.G. § 3A1.1(b)(1); and a two-level increase adjustment for Reckless

Endangerment During Flight pursuant to U.S.S.G. § 3C1.2. *See* ECF No. 27. The Government's

calculations of the applicable Guidelines are as follows:

**Carjacking (18 U.S.C. § 2119(1))**

| U.S.S.G. § | Description | # |
|---|---|---|
| 2B3.1(a) | Base Offense Level | 20 |
| 2B3.1(b)(2)(E) | Dangerous Weapon Brandished | +3 |

---

[2]    USPO and the parties all appear to agree that Counts One and Two are grouped into a single group pursuant to U.S.S.G. § 3D1.2(b) because they involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. Pursuant to USSG §3D1.3(a), in the case of counts grouped together pursuant to USSG §3D1.2(a)-(c), the offense level for the group is the offense level for the most serious of the counts, which in this case is Count One, the carjacking.

| 2B3.1(b)(3)(A) | Bodily Injury | +2 |
|---|---|---|
| 2B3.1(b)(5) | Carjacking | +2 |
| 3A1.1(b)(1) | Vulnerable Victim (Age) | +2 |
| 3C1.2 | Reckless Endangerment During Flight | +2 |
| Total Adjusted Offense Level | | 31 |
| | *Acceptance of Responsibility* | -3 |
| *Total Offense Level* | *87-108 months at Crim History II* | **28** |

Defendant also objected to the draft PSIR, contending that two specific offense characteristics should not apply: 1) a three-level increase for Brandishing a Dangerous Weapon pursuant to U.S.S.G. § 2B3.1(b)(2)(E); and 2) a two-level increase for Bodily Injury pursuant to U.S.S.G. § 2B3.1(b)(3)(A).[3] However, the Defendant admitted to making threatening statements, which would result in an alternative two-level increase under pursuant to U.S.S.G. § 2B3.1(b)(2)(F) even if U.S.S.G. § 2B3.1(b)(2)(E) did not apply. Therefore, the total offense level under the Defendant's calculations after acceptance of responsibility should be 21, resulting in a sentencing range of 41-51 months.

B. Count Three

The D.C. Voluntary Sentencing Guidelines do not apply to misdemeanor convictions.

**ARGUMENT AS TO APPLICABLE GUIDELINES**

A. U.S.S.G. § 3A1.1(b)(1) - Vulnerable Victims

The Court should apply the two-level increase pursuant to U.S.S.G. § 3A1.1(b)(1) because the Defendant knew or should have known that his elderly carjacking victims were unusually

---

[3]    The Defendant also objected to his conviction in Prince George's County, Maryland, Circuit Court on July 21, 2025, being included in his Criminal History score pursuant to U.S.S.G. § 4A1.2(a)(1) because it related to the relevant conduct in the instant offense. USPO adjusted the calculation in the final PSIR to exclude the Maryland conviction. *See* PSIR at ¶38. The Government agrees with the recalculated Criminal History score on this basis.

vulnerable due to their age.

The victims of the Defendant's carjacking were, at the time of the offense, 88 years old and 87 years old. This was not a marginal case. Their advanced age was obvious, and their physical vulnerability was readily apparent during the offense. The Defendant interacted with both victims at close range for over a minute before carrying out the carjacking, giving him ample opportunity to perceive their frailty.

The circumstances of the offense confirm that the victims' age and condition made them particularly susceptible to the Defendant's conduct. When one victim told the defendant she was "very, very ill" and needed to go to the hospital, the Defendant did not withdraw—he escalated. He reached through the window of the car and unlocked the car door. And the victim's natural physical state given their age played a role in the offense. The Defendant was able to remove the 88-year-old victim out of the driver's seat by physically dragging him by the arm and throwing him to the ground in part because of his physical advantage. Thus, the age and physical condition of the victims made them particularly susceptible to the Defendant's actions in using physical force to rob them of their car.

This is precisely the type of "particular susceptibility" the enhancement is designed to address. S*ee United States v. Fareri*, 712 F.3d 593, 595 (D.C. Cir. 2013) (finding it reasonable to apply the adjustment where the victims' characteristics made them "particularly susceptible").The victims' advanced age was not incidental—it materially facilitated the offense and increased the risk of harm.

Thus, the victims' age was unusual, was known to the Defendant, and specifically made them vulnerable to the conduct of the Defendant here. Therefore, the two-level enhancement pursuant to U.S.S.G. § 3A1.1(b)(1) should apply.

B.  U.S.S.G. § 3C1.2 - Reckless Endangerment During Flight

The specific offense characteristic of U.S.S.G. § 3C1.2 applies to the instant offense because the entire course of conduct here created a substantial risk of death or serious bodily injury to others while "in the course of fleeing from a law enforcement officer."

The defendant did not merely attempt to avoid arrest—he escalated at every step. After fleeing a traffic stop in Virginia, he drove at extreme speeds, exceeding 130 miles per hour at night with his headlights off, crossing into the District of Columbia. Law enforcement—including a helicopter—was forced to pursue him as he continued his attempt to evade capture. The Defendant's reckless driving alone would be sufficient to merit the enhancement. *See United States v. Benson*, 24 F.3d 1464 (D.C. Cir. 1994) (police chase through city streets ending with the car jumping a curb, crossing a sidewalk, and coming to a rest against a boundary wall bordering the yard of a house); *United States v. Washington*, 12 F.3d 1128, 1139 (D.C. Cir. 1994) (adjustment appropriate where the defendant "drove in a fast and reckless manner through a series of neighborhood alleys and ended up flipping his car"); *Nelson v. United States*, 406 F. Supp. 2d 73, 74 (D.D.C. 2005) (applying the adjustment where attempting to flee police achieving speeds estimated at 100 miles per hour).

In this matter, before the instant offense, the Defendant was involved in a traffic stop at 10:53 p.m. on March 30, 2025, on Interstate 66 near Haymarket, Virginia. The Defendant then fled the traffic stop, and his conduct during the instant offense appears to have been motivated by a continued attempt to evade detection and flee law enforcement. The Defendant was aware that he was on probation and on pretrial release in a number of different criminal cases at the time of the traffic stop. He therefore fled, driving at speeds exceeding 130 miles per hour with his headlights off until he reached Washington, D.C., and abandoned his vehicle.

17

After abandoning his vehicle, the Defendant compounded the danger by falsely reporting an emergency to divert officers away from his path. That calculated act triggered an armed police response in a residential neighborhood, creating a volatile and unnecessary risk to residents and responding officers alike.

When those efforts failed, the Defendant turned to violence, committing a carjacking to secure a means of escape, which he then used the escape to yet another jurisdiction, driving at speeds of 90 miles per hour—nearly double the speed limit—and ultimately disabling the car. This sequence: reckless driving, a fabricated emergency, and a violent carjacking, was part of a continuous effort to avoid law enforcement, each step increasing the danger to the public.

Thus, the Defendant's dangerous driving, his false report which resulted in an armed police response, and his carjacking all "created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer" and therefore should result in an increase by levels pursuant to U.S.S.G. § 3C1.2.

C. <u>U.S.S.G. § 2B3.1(b)(2)(E) – Dangerous Weapon Brandished</u>

Despite the Defendant's objection, the specific offense characteristic of § 2B3.1(b)(2)(E) clearly applies in this matter.

Application Note 2 of the Commentary to 2B3.1 makes clear that "an object shall be considered to be a dangerous weapon for purposes of subsection (b)(2)(E) if . . . (B) the defendant used the object in a manner that created the impression that the object was an instrument capable of inflicting death or serious bodily injury (e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)." In *United States v. Davis*, 635 F.3d 1222 (2011), the D.C. Circuit collected cases where the dangerous weapon specific offense characteristic was applied when defendants used their hands to imitate weapons.

During the carjacking, the Defendant told the victims that he had a gun and that he would shoot them. He reinforced that threat by placing his hands concealed in his sweatshirt pocket with his fingers extended, mimicking the presence of a weapon. The victims remarked that they were their reactions were intended to avoid the risk of confrontation because they were concerned the Defendant was armed.   Thus, the three-level increase for a dangerous weapon brandished or possessed would apply here pursuant to U.S.S.G. § 2B3.1(b)(2)(E) .

D.  U.S.S.G. § 2B3.1(b)(3)(A) - Bodily Injury

The specific offense characteristic for bodily injury should apply here based on the injuries suffered by CW-3.

The 88-year-old victim reported that, while he did not seek medical treatment, he discovered when he got home that his thigh was very bloody to the point that his trousers were stuck to his leg by the blood. In addition, he suffered significant scraping and bruising to the forearm where the Defendant had grabbed him to pull him from the car.

"[B]odily injury" is defined in USSG §1B1.1, comment.(n.1) as "any significant injury; *e.g.,* an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." This enhancement has been upheld in numerous cases where the injury is minor. S*ee United States v. Eubanks*, 593 F.3d 645 (7th Cir. 2010) (scratches and bruising); United States v. *Sumner*, 171 F.3d 636 (8th Cir. 1999) (puffy face and black eye). Here, the photographs of CW-3's injuries makes clear that they are painful and obvious."

The injuries here—bleeding, bruising, and abrasions in an 88-year-old caused by being forcibly thrown to the ground—readily satisfy that standard. Therefore, the two-level increase of the specific offense characteristic set out in U.S.S.G. § 2B3.1(b)(3)(A) applies here.

19

**THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The Government requests that the Court sentence the Defendant to 102 months of imprisonment, followed by 3 years of supervised release, with regard to Counts One and Two. For Count Three, the Government requests a sentence of 6 months of imprisonment, to be served consecutively. This sentence – toward the top of the applicable Guidelines' range – reflects the nature of this offense, accounts for the Defendant's criminal history, and provides adequate deterrence to the Defendant and others in the community. The sentence is particularly warranted given the Defendant's extraordinary disregard for the danger to innocent persons caused by his conduct, as well as his notable criminal history given his age.

I.    **The Nature and Circumstances of the Defendant's Offense.**

The nature and circumstances of the offense are incredibly serious and warrant a lengthy period of incarceration as reflected in the Guidelines range. The Defendant committed a violent crime against vulnerable, elderly members of the community in the course of a broader, escalating effort to evade law enforcement.

While fleeing from law enforcement after a traffic stop, the Defendant called 911 at 1:30 a.m. to falsely report a shooting a few blocks away. The false report was calculated to prompt an armed police response at a residential address late at night, disregarding the risk of injury or death to the occupants of the house, bystanders, or first responders. The Defendant's actions caused an innocent family to be awakened in the dark of night to sirens and lights outside their home, creating confusion, fear and a highly volatile situation based entirely on a fabricated report.

The Defendant's conduct did not end there. Later that night, the Defendant demonstrated a willingness to use violence on a whim against strangers he happened upon outside of Union Station for physical property. The Defendant terrorized his victims, implying that he had a gun and telling

20

them that they would die if they did not give him their car. Video evidence of the carjacking shows the Defendant physically wrench an 88-year-old man from the driver seat of a car with enough force to cause the victim to sprawl to the ground. The victim suffered wounds and bleeding from being thrown to the ground. The Defendant then demonstrated a further disregard for the safety of others by entering the car and driving away before the victim can get up, nearly running the victim over.

This was not impulsive or isolated conduct. It was a sequence of deliberate, escalating decisions that demonstrated a willingness to endanger anyone in his path- residents, law enforcement, and particularly vulnerable victims—so long as it furthered his flight.

In sum, the Defendant's conduct was terrifying and demonstrated a callous disregard for the basic safety of innocent and vulnerable victims. It justifies an extended term of incarceration, at the top of Guidelines range.

## II.     <u>The History and Characteristics of the Defendant.</u>

The Defendant's brief but remarkable history demonstrates the need for a significant sentence. The Defendant is only 23 years old, yet already has four criminal convictions, including at least two felony convictions. *See* PSIR at ¶¶ 35-38. Further, the Defendant committed the instant offenses while apparently on probation for convictions in two other jurisdictions. *See id.* at ¶ 35-36.

Further, at the time of the offense, the Defendant appears to have had seven other open cases outside of this jurisdiction. *See id.* at ¶ 42-51. Notably, the charges in those pending cases include Robbery, Criminal Contempt – 1st Degree: Violation of Protection Order; Tampering with Physical Evidence: Conceal/Destroy; Resisting Arrest; Obstruct Government Administration;

Strangulation: 2nd Degree; and Assault 3rd Degree. *See id.* Thus, the Defendant's history demonstrates a persistent tendency to continue committing serious and violent offenses.

The Government has serious concerns about the contradictions regarding mental health conditions and the Defendant's apparent disinterest in treatment. The Defendant indicated that he has not engaged in any mental health treatment and denied any prior mental health diagnosis. *See id.* at ¶ 67. However, the Defendant's mother told USPO that the Defendant had treated. *Id.* at ¶ 72. Despite having been involuntarily admitted and being prescribed medication in 2019, the Defendant did not participate in any follow-up treatment. *See id.* at ¶¶ 67 and 71. The Defendant does not appear to have taken advantage of any mental health treatment despite its availability at the D.C. jail. *See id.* at ¶ 70.

The Defendant appears to have a serious history of substance abuse, which he has made no apparent effort to address. The Defendant told USPO that he consumed marijuana for the last nine years and uses it multiple times a day. *See id.* at ¶ 73. He also told USPO that he had regularly used Xanax and Percocet for the last three years. *See id.* However, his account to USPO does not appear to be fully forthright. See id at ¶ 78 (noting that D.C. Jail medical records indicate that the Defendant also used "benzodiazepines for one to two years . . . and a history of "purple" use for two years."). While the Defendant's struggles with substance abuse are lamentable, it is notable that he had largely failed to seek treatment for substance abuse, even when the issues resulted in criminal conduct, likely including the instant offense. *See id.* at ¶ 76 (the Defendant "was referred to substance use treatment through probation supervision for a prior offense; however, he never attended treatment sessions after the evaluation was completed in January 2025[.]").

The Defendant's history and characteristics—a substantial criminal record four convictions including two felonies in the last three years, as well as a large number of unresolved open criminal

cases involving violence—reflects more than poor judgment; it demonstrates a persistent willingness to engage in serious and increasingly dangerous criminal conduct. The instant offense is no mere aberration, but instead justifies a term of substantial imprisonment toward the top of the Guidelines range.

III.    **The Need for the Sentence Imposed.**

The requested sentence is sufficient but not greater than necessary to meet the goals of sentencing.

First, the sentence must protect the public. The defendant's conduct—fleeing law enforcement at high speeds, fabricating an emergency to divert police, and violently carjacking an elderly victim- demonstrates a clear and ongoing danger to the community. A significant term of incarceration is necessary to prevent further harm.

Second, the sentence must promote respect for the law and provide just punishment,. The defendant committed these offenses while already on probation and under court supervision, demonstrating a profound disregard for legal authority. A meaningful sentence is required to reflect the seriousness of that conduct and reinforce that such behavior carried substantial consequences.

Third, the sentence must afford adequate deterrence: it will keep our community safe from the Defendant terrifying or endangering residents in D.C. for a significant period of time. It is also necessary to promote the Defendant's respect for the law. The Defendant has evidenced the need for such a lengthy sentence given that he continues to be arrested for violent and dangerous crimes while still on probation or pretrial release. The Defendant's conduct reflects a blatant disrespect for the law and the criminal matters he has faced to date. Thus, a top of the guidelines sentence is more likely to deter him from future criminal conduct.

23

The sentence also provides general deterrence to similar criminal conduct: it will signal to the community that violent carjacking offenses are not tolerated in the District of Columbia. A lesser sentence would send the opposite message. And it provides an opportunity for the Defendant to reflect on the serious nature of his crimes.

Finally, a lengthy sentence provides the Defendant ample opportunity to obtain any necessary programming to address the root causes of his recent spree of criminal actions, whether that be through mental health treatment, substance abuse treatment, education, or some other correctional treatment.

In sum the Defendant's conduct combined with his criminal history and demonstrated unwillingness to comply with the law warrants a sentence at the upper end of the applicable guidelines.

## CONCLUSION

For all the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 102 months of incarceration, followed by three years of supervised release with regard to Counts One and Two. With regard to Count Three, the Government respectfully requests that the Court impose a sentence of 6 months, to be served consecutively.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney


By:    */s/ Brendan M. Horan*
Brendan M. Horan
Special Assistant United States Attorney
N.Y. Bar No. 5302294
601 D Street NW
Washington, DC 20579
(202) 730-6871
Brendan.Horan@usdoj.gov

24